1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE MIDDLE DISTRICT OF GEORGIA

3                           VALDOSTA DIVISION

4                    _____

5  FLOWERS BAKERIES BRANDS, LLC,   :
                         PLAINTIFF  : Case No. 7:13-CV-138
6  VS                              :
                                   :     February 11, 2015
7                                  :
   EARTHGRAINS BAKING COMPANIES    :    Macon, Georgia
8  INC., ET AL       DEFENDANTS. :
   _____
9
                         TELEPHONE CONFERENCE
10

11               BEFORE THE HONORABLE HUGH LAWSON
                 UNITED STATES DISTRICT JUDGE, PRESIDING
12

13  APPEARANCES:

14   FOR THE PLAINTIFF:       GEORGE R. LILLY, II
                              411 GORDON AVENUE
15                            THOMASVILLE, GA 31792

16                            WILLIAM H. BREWSTER
                              1100 PEACHTREE ST., STE 2800
17                            ATLANTA, GA 30309

18   FOR THE DEFENDANTS:      HOWARD MICHAEL
                              NBC TOWER STE 3600
19                            455 N CITYFRONT PLAZA DR.
                              CHICAGO, IL 60611-5599
20
                              H. JEROME STRICKLAND
21                            P. O. BOX 6437
                              MACON GA 31208
22
   _____
23                     TAMMY W. FLETCHER   USCR
                          P. O. BOX 539
24                     MACON, GA 31202-0539
                         (478-752-3497)
25

1                    P R O C E E D I N G S

2    February 11, 2015

3              COURTROOM DEPUTY:   Mr. Lilly?

4              MR. LILLY:   Yes, ma'am.

5              COURTROOM DEPUTY:   Mr. Brewster?

6              MR. BREWSTER:   Yes, ma'am.

7              COURTROOM DEPUTY:   Mr. Michael?

8              MR. MICHAEL:   Hello, yes.

9              COURTROOM DEPUTY:   And Mr. Strickland?

10             MR. STRICKLAND:   Yes, ma'am.

11             COURTROOM DEPUTY:   Judge Lawson is with us

12   now.

13             THE COURT:   Good morning.

14             ATTORNEYS COLLECTIVELY:  Good morning, Your

15   Honor.

16             THE COURT:   I believe this call was instigated

17   by the Plaintiffs.

18             MR. BREWSTER:  Yes, sir.

19             THE COURT:   Is that you Mr. Brewster?

20             MR. BREWSTER:  Yes, Your Honor, it is.

21             THE COURT:   Go ahead.

22             MR. BREWSTER:   We sent that letter to you a

23   couple of weeks ago responding, at least in part, to you

24   admonition to us late in November to bring matters to your

25   attention and to do so promptly.  After we had that

1    hearing with you in November we finally got the documents

2    from Defendants.  There were some glitches in their

3    production.  We had to go back to them because they had

4    missed about 600 documents that were still redacted.  But

5    when that finally happened we all put our hands down and

6    we were taking a series of depositions.  And it got to be

7    their 30(b)(6) deposition and as I have said to some folks

8    here, we finally looked up and realized that what we saw

9    was not the light at the end of the tunnel but, in fact, a

10   train coming the other way.

11          In that deposition we learned that the

12   Defendants were changing their packaging to a packaging

13   that was not yet decided, that had not been produced,

14   that they were going to ramp up their advertising to

15   double what they had done previously and we have not --

16   and no advertising in any draft or form has been produced,

17   and that they were going to roll out their Nature's

18   Harvest product nationally; including into what is our

19   core territory in the South and mid-South over to Texas.

20   That they were going to do that in April of 2015, which

21   would occur not only after the close of fact discovery but

22   after we had done the expert work that would go into the

23   case including, for example, surveys regarding their

24   packaging.

25          It became apparent to us that that was going to

1    have a dramatic impact on the case.  In no small part

2    because the Eleventh Circuit has laid out seven factors

3    that aren't exclusive but that the Court should consider.

4    And they include, at lease, four that will be dramatically

5    impacted by this development.

6            The first is the strength of the mark.  It is

7    conceded that our mark is stronger in the Southeast and

8    where it's been sold for over 35 years as opposed to the

9    areas in California and the Northeast where the parties

10   are overlapped but Flowers has only been for a couple of

11   years.  The similarity of the marks gets assessed in the

12   context of packaging and obviously they will have revised

13   packaging.

14           Similarly the advertising is a factor and the

15   advertising will be different.

16           And last but not least, by coming into our

17   territory and doing so, given the timing, we anticipate

18   that there will be a dramatic increase in the actual

19   confusion that occurs between the party's products.  That

20   it will go from dozens that have been identified to

21   hundreds.

22           We know it also will have a significant impact

23   on the expert work.  I would not expect, for example,

24   the Defendant would concede that our work that we've

25   done on their prior packaging is binding on their new

1    packaging.

2          And so a tremendous amount of work would have

3    been done that would not get taken into account in

4    discovery and we would be hurdling toward a trial where

5    the package was different, the advertising was different,

6    and there was rampant actual confusion.

7          We knew it was not a good idea just to wait for

8    all that to happen and then raise our hands.  We

9    considered a number of options.  One was to do nothing

10   now.

11         We could file a new lawsuit in April when they

12   launched on the new packaging and the national expansion.

13   We knew that that created some risks of being disruptive.

14   The Court would have been surprised.  It would be very

15   disruptive of the schedules that were under way at the

16   time.  And the parties would have wasted a lot of

17   resources between now and then heading in a different

18   direction.

19         We could have talked about seeking some

20   expedited relief and filing motions to try to intervene

21   in the expansion into our more historic core territories.

22   That also would be disruptive in terms of the

23   extraordinary work in a short term.  And we realized that

24   if, you know, the option is having a trial later this year

25   or hearing motions in the spring that that again has some

1    benefits to sort of rolling this altogether.

2           That led us to the conclusion, Your Honor, on

3    our part that the smarter course, in terms of efficiency,

4    was to allow fact discovery to conclude on the historic

5    packaging and what they've been doing to date.  And then

6    to essentially have a short period of hiatus and once they

7    launch in April to have a brief period of discovery that

8    would be just about the new package, the new advertising

9    and whatever had resulted new in terms of actual confusion

10   or other events from what transpired.  That is a short

11   delay but we thought much less disruptive.

12          It's a period that could be as short as 60 days

13   if the Defendants actually produced their documents.

14   Thirty days after we serve discovery instead of prolonging

15   the period and producing them much later.  If they were

16   going to have difficulties with that maybe it would be

17   75 or 90 days.

18          But we would anticipate discovery really

19   centered around these new issues, the new package, the new

20   advertising, new actual confusion and the like.  That

21   would then be followed by expert reports that could take

22   all of these facts into consideration.

23          We raised this issue with the Defendants over

24   the course of a few days and ultimately their position

25   is that nothing should occur.  They say so for two

1   reasons.

2          The first is that we should have known this

3   long ago.  I can assure the Court we did not know.  We

4   certainly didn't know with any degree of certainty.  Part

5   of the reason that we would not have known is that a lot

6   of the documents were redacted including the ones they

7   point to.  So in not producing those documents until the

8   middle of December I think there was a hazard that we

9   wouldn't know it until the middle of January.

10          But, in addition, we have gone back and looked

11   at every document in hindsight that might have possibly

12   told us that this was going to occur.  And while there are

13   a handful of documents that talk about a potential launch

14   in the spring of 2015, there are even more documents that

15   talk about the fall of 2015 or the spring of 2016 or some

16   other dates in the future.  And obviously we weren't sure

17   until they set those dates.  The timing was not confirmed

18   until that deposition and then we proceeded to sort of

19   put these chain of events that has led us to the call

20   today.

21          The Defendants also note that the parties have

22   done a good bit of work so far.  They are correct about

23   that but there has been nothing unusual about that.  It's

24   been essentially the work that's been done on their

25   packaging and their advertising and their activities to

1    date.  But none of that, because they haven't produced the

2    new packaging and they haven't produced the new

3    advertising, and none of that could have been directed

4    towards this new subject matter.

5         Their letter to the Court doesn't raise any

6    other issues other than we should have known and a lot's

7    been done.

8         The reality is two months from now there are

9    going to be some substantial events that would

10   dramatically change the nature and scope of the case.

11   They've got no response to a proposal to deal with that.

12   We know it needs to be dealt with.  We don't want to just

13   put it off and then ask the Court two months from now to

14   be dealing with it on what then would be an urgent and

15   disruptive basis to the rest of the case.

16        So we think it makes a lot of sense to follow

17   the course that we suggested in the letter and that we've

18   urged and that the alternative is going to create a lot of

19   disruption for us but particularly the Court.

20        Ultimately getting to the bottom of the

21   confusion is in the public interest.  If they launch in

22   our territory and wide spread confusion occurs we ought to

23   be entitled to get it in.  And it's in everybody's

24   interest to get that right.

25        So we think this is a wise course to take and

1    that simply doing nothing now would really be an

2    inadvisable course to take.

3            THE COURT:   Thank you.  Mr. Michaels and Mr.

4    Strickland?

5            MR. MICHAEL:   Yes, Your Honor.  This is Howard

6    Michael on behalf of the Defendants from the Brinks Gilson

7    firm.

8            I wanted to make a couple of points in response.

9    Initially we don't think this request is timely.  As we

10   indicated in our letter to the Court, Defendants produced

11   documents concerning its plan for 2015 and beyond at least

12   as early as August of 2014.  So that is roughly a half a

13   year ago.  We've gone back and confirmed that these

14   documents were not redacted.  This material was made

15   available to the Plaintiff, again at least as early as

16   August of last year.

17           Once more, Your Honor, the Plaintiff had an

18   opportunity to take deposition testimony from at least two

19   of the Defendants vendors concerning its 2015 plans in

20   December.  So even if you discount the document production

21   from summer of last year the Plaintiff waited at lease two

22   months after taking that deposition testimony before it

23   raised this issue with the Court's attention.

24           As the Court is aware discovery in this case

25   has been ongoing now for more than a year.  It has been

1    extended no fewer than three times and we're pushing now

2    almost 14 months of discovery in this case.

3            The basis for Plaintiff's request is twofold as

4    counsel indicated.  One is this idea of a national launch

5    purportedly to occur sometime in the spring of this year.

6    And the second is a possible refresh to the Defendant's

7    product packaging and I just wanted to briefly address

8    each of those issues in turn.

9            First, with respect to this idea of a national

10   launch.  You know, that term is taken a little bit out of

11   context, Your Honor.  The national launch language is more

12   of a marketing phrase than it is a strategic businesslike

13   phrase.  And, in fact, as we indicated in our letter, Your

14   Honor, since the product, the Nature's Harvest product,

15   was expanded into Southern California in February of 2013,

16   Defendants have continued to roll out the product across

17   the country on an ongoing basis.

18           And I can give you some dates for some of the

19   regions just to put this into some context.  The product

20   was expanded into the specific region in February of 2013

21   into the Intermountain region in February of 2013, the

22   Midwest in April of 2013, the Metro Atlantic region and

23   the Northeast region which would include major markets

24   such as New York City, Baltimore, Philadelphia, Pittsburgh

25   in July and September of 2013.

1           So in all of these regions this expansion has

2      been ongoing for, you know, two years, a year and a half,

3      and most of the major markets in these regions the

4      Plaintiff's product, Nature's Own, and the Defendant's

5      product, Nature's Harvest have been competing against one

6      another in major markets.  So, for example, the products

7      are competing currently in Baltimore, in Denver, in Kansas

8      City, and Las Vegas, Los Angeles, Philadelphia, San Diego,

9      San Francisco, St. Louis, Wichita.  So in all of these

10     areas the products have been competing against one

11     another.  And if there was discovery to be taken

12     concerning actual confusion, the Plaintiff had ample

13     opportunity to take that discovery and there's nothing

14     unique about any additional region which would change that

15     calculus.

16          Secondly, Your Honor, with respect to the

17     product packaging.  The Plaintiff, just the end of last

18     week, took the deposition of one of Defendants vendors, a

19     Valentine Design.  And specifically the witness in that

20     deposition was Kevin McMahon who is the vice president of

21     Valentine Design.  Valentine Design is the key vendor that

22     is involved in this potential product packaging refresh

23     that the Defendants are considering.  During his

24     deposition Mr. McMahon testified that as of last week,

25     and to my knowledge nothing has changed since then, the

1    Defendants are considering a multitude of different

2    product variations as part of this product refresh,

3    including not changing their product packaging at all.

4           So no decision has been made on a specific

5    package that may or may not be used going forward.  It's

6    still under consideration and again there's even a

7    possibility that no product package change would

8    ultimately occur.

9           Now, based on that the way we read the

10   Plaintiff's request is it's looking for a stay in this

11   case pending the introduction of this possible new product

12   packaging.  We can't even assess a potential timeframe

13   when that packaging may hit the market.  Indeed the

14   potential stay is indefinite in length.

15          Again, the parties now have been in discovery

16   for just about fourteen months.  The Plaintiff has had

17   ample opportunity to take discovery on every issue in this

18   case that it sought to take discovery on.  It's time now

19   for the parties to put their cards on the table and see

20   what we have.

21          THE COURT:  What is it that is anticipated will

22   occur in April, Mr. Brewster?

23          MR. BREWSTER:  Your Honor, according to what

24   their 30(b)(6) witness told us in April their product

25   launch would go from being in a couple different regions

1  in the US to being national, which means both across the

2  US but it also means that it would go from areas where

3  either of the parties has only been for a year or two to

4  them coming into the South where we've been for 35 years.

5  The notion that there's nothing unique about or different

6  about this region it simply is not true.  It is

7  dramatically different and it will dramatically change the

8  nature of the case.  So in addition to that geographic

9  extension --

10        THE COURT:   Why is that?

11        MR. BREWSTER:   So, Your Honor, the Eleventh

12  Circuit factors, the very first one they say is frequently

13  the most important is the strength of the mark.  You've

14  got a number of the cases from the Eleventh Circuit saying

15  that that could be a determinative factor.

16        Here there is no question that in markets

17  across the South where Nature's Own has been sold for 35

18  years that the recognition of it, unaided and aided

19  recognition, recall from consumers is substantially higher

20  by orders of magnitude than it would be in a market --

21  we'll pick like Baltimore where we've been for less than a

22  year.

23        THE COURT:   Well listen, that's always been

24  true has it not?

25        MR. BREWSTER:   It's been true that it is

1    stronger here and it's been true that they are not present

2    here.

3            THE COURT:   Well, how is that going to change

4    the progress of the case?

5            MR. BREWSTER:   Well, Your Honor, we would

6    expect the biggest thing that we would expect from outside

7    of the parties is the notion that you're going to have

8    consumers and by that I mean people at the store level and

9    at the public level who are going to have actual

10   confusion.   They're going to pick up the wrong package.

11   They're going to call us and say they got the wrong

12   package.   They're going to call us and say it's out of

13   stock.

14           And we expect that that will happen

15   significantly and that those are witnesses that we would

16   want to include in this case and that it makes a lot more

17   sense for us to include them without the disruption of

18   showing up in April and saying we've got a whole bunch of

19   witnesses that we're going to identify and we've got

20   dozens and dozens and dozens of new witnesses and the

21   Defendant is going to say those witnesses should have been

22   identified before and we are going to say, no, they

23   couldn't be identified.   And somebody is going to say,

24   well, we'd like to have some discovery about those if

25   you're going to add them.

1        So we're going to be adding actual confusion

2   witnesses and instead of taking that up in April and

3   having a discussion about how to structure that, we

4   thought it made sense to structure it now.  The comment at

5   the end that --

6        THE COURT:   These witnesses to whom you refer

7   these are potential customers who you believe will be

8   confused?

9        MR. BREWSTER:   Yes, Your Honor.  So far in the

10  case, you know, across different situations we'll get a

11  call from a grocery store that will say, "Hey, come fill

12  up your product", and we show up and what's missing is

13  Nature's Harvest and not Nature's Own.

14       Or a consumer will call us and say that they see

15  that we have changed our formula when, in fact, they're

16  calling us about Nature's Harvest.

17       What is going to happen, and not that I have a

18  crystal ball, but based on the substantial strength of the

19  market in this region I know that in April or May in that

20  timeframe we're going to be coming to the Court and saying

21  we've got overwhelming evidence of actual confusion.  We

22  want those witnesses to be available to participate in the

23  trial.  And that's going to be something that is going to

24  -- there will be an awful lot of gnashing of teeth.  Can

25  we call those witnesses?  And the Defendants are going to

1    say, "That's fine, they can call those witnesses.  We've

2    known all along there was actual confusion.  We're not

3    worried about deposing them."  I'm not sure if that's

4    going to happen.

5            At the same time, Your Honor, the survey work

6    that would be done to demonstrate confusion you're

7    supposed to do in a universe which is where the product is

8    sold.  So far you would have been talking to people who

9    were not in the southeast because that's not where they

10   would have encountered the product.  And now you would be

11   doing work with a completely different universe with

12   people who, our documents and their documents say, that

13   more than half the people if you ask them in the South

14   name a bread more than half say Nature's Own.

15           THE COURT:  Well, listen --

16           MR. BREWSTER:  In other parts of the country

17   it's a lot lower.

18           THE COURT:  Taking what you say at face value,

19   why aren't we faced with a situation where you would be

20   making the same argument and asking for the same delay

21   every time they might go into a new market?

22           MR. BREWSTER:  Well, Your Honor, here we've got

23   the one situation which is they're going from, what I'll

24   call a bunch of fringe markets and they're going to our

25   core market.  And they'll go -- it will be a national

1    launch so there won't be any new markets.

2    |       You are correct that if this was an incremental

3    thing we might be facing this issue at different points in

4    time.  But this is kind of a one time event where they are

5    going national.  They didn't launch that way to begin with

6    or we wouldn't have had this issue.

7            So this is a -- you are right that in other

8    situations it maybe could happen incrementally and

9    continuously.  Here it would be a one time dramatic

10   change.

11           THE COURT:  Mr. Michael?

12           MR. MICHAEL:  Your Honor --

13           THE COURT:  Mr. Michael.  Question?

14           MR. MICHAEL:  Yes, sir.

15           THE COURT:  Are you all going to make this move

16   in April?

17           MR. MICHAEL:  What's going to happen in April,

18   Your Honor --

19           THE COURT:  Answer my question.  Yes or no?

20           MR. MICHAEL:  There will be a continuation of

21   the national rollout in April as has been occurring for

22   the last two years.

23           THE COURT:  Are you moving into the Southeast

24   in April?

25           MR. MICHAEL:  The intent is that there will be

1    some movement into the Southeast in April.  But again

2    there's already a product available in the areas of the

3    South in April.

4            THE COURT:   Where?

5            MR. MICHAEL:   For example in Oklahoma and

6    Texas.

7            THE COURT:   That is not the --

8            MR. MICHAEL:  And areas of Virginia.

9            THE COURT:   That's that other Southeast.

10           MR. MICHAEL:  The point, Your Honor, is that

11   there has been a continual rollout of this product for the

12   last two years.

13           And, Your Honor, your point is well taken.  If

14   we accept the Plaintiffs rationale at face value then, in

15   cases like this, business activities of both litigants

16   would essentially have to remain static.  There can be no

17   change in markets.  There can be no tweaks to product

18   packaging because every time there were, there would be

19   a basis to either continue discovery or to reopen

20   discovery.

21           The same rationale could be made if Defendants

22   were to move into a different market other than the

23   Southeast.  Again there's already been ample opportunity

24   in this case where the products have been competing

25   against one another in the same market.  A market like

1    New York City or Denver or San Francisco those are not

2    fringe markets.  Those are major markets where the

3    Plaintiff had an opportunity to go in and take discovery

4    concerning evidence of actual confusion if it existed.

5             THE COURT:   Okay.  I'm going to put you all on

6    hold.

7    (BRIEF RECESS)

8             THE COURT:   Gentlemen, are you still there?

9             MR. BREWSTER:  We are, Your Honor.

10            MR. MICHAEL:  Yes, sir.

11            MR. STRICKLAND:  Yes, sir.

12            THE COURT:   Here's what I'm going to do.  I

13   am going to extend discovery to July 1, 2015.  I'm

14   going to extend the expert phase of it to October 1,

15   2015.

16            Whatever you intend to do by way of discovery

17   and experts has got to be completed within that time.

18   I'm not going to grant any more extensions.  You know,

19   you can go out back and fall on your sword for all I

20   care.  There ain't going to be any more extension

21   granted.

22            I will expect both parties to be cooperative and

23   forthcoming where discovery is concerned.  If there are

24   any problems about that I expect you to pick up the phone

25   and call me immediately.  If I determine that either party

1    is not being forthcoming, is not being cooperative in a

2    way that I think it ought to be done, then there are going

3    to be sanctions levied.

4              Do any of you have any questions?

5              MR. BREWSTER:  No, Your Honor, thank you.

6              THE COURT:   Mr. Brewster, do you?

7              MR. LILLY:  No, Your Honor.  That was Mr.

8    Brewster, thank you.

9              THE COURT:   Mr. Michael?

10             MR. MICHAEL:  No, sir.  No questions.  Thank

11   you.

12             THE COURT:   Anything else we need to discuss?

13             MR. STRICKLAND:   Your Honor, should we submit

14   a proposed order that fits what the Court just decided?

15             THE COURT:   Yes, that will be fine.

16             MR. STRICKLAND:  Because we've got different

17   schedule dates and --

18             THE COURT:   This is Jerome Strickland, is it

19   not?

20             MR. STRICKLAND:   Yes, Your Honor.

21             THE COURT:   Yes, Mr. Strickland, go ahead and

22   submit one but go on and do it promptly.

23             MR. STRICKLAND:   Will do.

24             THE COURT:   Anything else?

25             MR. STRICKLAND:  Thank you, Your Honor.

1                THE COURT:   Good to talk to you.

2

3        (The telephone conference was concluded)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, Tammy W. Fletcher, Federal Official Court

 4     Reporter, in and for the United States District Court for

 5     the Middle District of Georgia, do hereby certify that the

 6     foregoing is a true and correct transcript of the reported

 7     proceedings held in the above-entitled matter and that the

 8     transcript page format is in conformance with the

 9     regulations of the Judicial Conference of the United

10     States.

11

12                          Dated this 24th day of August, 2015.

13                          Tammy W. Fletcher

14                          _____

15                          TAMMY W. FLETCHER, CCR
                            FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```